# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　　　Respondent,<br><br>　　v.<br><br>RYAN MICHAEL PITTMAN,<br><br>　　　　　　　　　Appellant. | No.  59432-3-II<br><br><br>UNPUBLISHED OPINION |

CHE, J. — Ryan Pittman appeals his convictions for three counts of first degree child rape and two counts of second degree rape.

Pittman raped two of his ex-girlfriend's children, EC and EP.  Prior to trial, Pittman moved to sever the counts involving one child from the other child.  The trial court denied Pittman's motion and all the counts were tried together.  Pittman did not renew his motion to sever.  The jury convicted Pittman of three counts of first degree child rape involving EC and two counts of second degree rape involving EP.

Pittman argues that the trial court abused its discretion by denying his motion to sever and that he received ineffective assistance of counsel because his attorney failed to renew the motion to sever.  He also raises multiple claims in a statement of additional grounds (SAG).

We hold that because Pittman failed to renew his motion to sever before or at the close of all the evidence, this issue is waived, Pittman's ineffective assistance of counsel claim fails because he has not shown prejudice, and Pittman's SAG claims are unreviewable or fail on the merits.

Accordingly, we affirm Pittman's convictions.

## FACTS

### BACKGROUND

Pittman met AC in 2017, and they began dating right away. Pittman then moved into AC's home. AC's household included her mother, adult roommates, and four children, including EC[1] and EP. EC was around 8 years old and EP was 14 years old when Pittman moved into their home. Pittman's three children intermittently stayed at the house as well.[2] Pittman lived in AC's home for about two years before moving out when they broke up in 2019.

According to EP, it was obvious that people, including her mother, were doing drugs in the home. AC admitted she had issues with methamphetamine use and that this interfered with how she ran the household. At some point, AC started a job that required her to work evenings through mornings, once every weekend. Pittman was in charge of the household in her absence.

In June 2020, AC reported to law enforcement that EC told her there had been sexual contact between EC and Pittman. An officer came to the house and took a report. Law enforcement told AC to take EC for a medical examination and forensic interview, which AC did.

EP moved out of the house before she turned 16 and at some point learned of EC's disclosure. EP did not talk directly to EC about what EC had disclosed. EP eventually disclosed that Pittman sexually abused her to her grandparents and mother. EP did so because it was

---

[1] After the incidents occurred but before trial, EC, born female, began using a different name and male pronouns. While the events occurred when EC identified as female, EC now identifies as male, so we use he/him pronouns.

[2] EC testified that he "[l]iked it when [Pittman's kids] were [at the house] because [Pittman] wouldn't do anything to [him] when they were there." 4 Rep. of Proc. at 346.

"weighing on [her]," and she knew EC had made a disclosure. 6 Rep. of Proc. (Jan. 9, 2024) (6 RP) at 554.

The State charged Pittman with three counts of first degree child rape involving EC (counts 1-3), two counts of second degree rape involving EP (counts 4-5), and two counts of third degree child rape involving EP (counts 6-7), each with an aggravating circumstance of use of a position of trust, confidence, or fiduciary responsibility to facilitate commission of the crimes.

PRETRIAL MOTION TO SEVER CHARGES

Pittman moved to sever the counts involving EC (counts 1-3) from those involving EP (counts 4-7). In his motion, Pittman primarily argued that joinder would prejudice him because of a substantial likelihood that the jury would improperly cumulate the evidence rather than decide each charge based on its own merit. Pittman contended that the State's charges varied in strength, which would further lead the jury to "cumulate and confuse the evidence and use the strength of the proof as to some charges to infer guilt in those charges with less substantial evidence." Clerk's Papers (CP) at 46. Pittman also argued that the charges and the factual allegations underlying the charges were not cross admissible under Evidence Rule (ER) 404(b).

At the motion hearing, Pittman acknowledged that the offenses were similar, stating, "These two sets of counts are certainly similar, right? The nature in and of themselves, the words themselves of what the type of crime is is certainly similar. The relationship to Mr. Pittman is also similar. The residence is also similar." 3 RP (Jan. 3, 2024) (3 RP) at 222-23. But he argued the offenses were distinct by age and time. Additionally, Pittman argued that the counts involving EP included alcohol and intoxication from alcohol, but the counts involving EC

did not. Pittman confirmed that the defenses for both sets of counts would be the same, stating,

"the title of the defense would be the same: [g]eneral denial for both." 3 RP at 225-26.

The trial court denied Pittman's motion to sever and analyzed four factors in reaching its

decision:

> The first is strength of the State's evidence as to each count. Here, my understanding is that the alleged victims will be testifying as to what happened to them and that Mr. Pittman, the accused, is the one that did it. Militating against that is, of course, there's delayed disclosure on both, parts of both folks, both alleged victims, and at least in one of them, there is at least evidence that may undermine her credibility because of her intoxication. . . .
>
> Two is the clarity of the defendant's defenses. While it may be true that, as [defense counsel] points out, he would handle the defense differently as to each alleged victim, the defenses are the same. The defenses are, number one, it's general denial, but number two, that it's to undermine -- at its base is to undermine the credibility of each of these alleged victims. . . .
>
> Three is that the Court's trial instructions directing the jury to consider each count separately. . . . [T]he Court has already said that . . . its intention is to give an instruction that the jury should consider each of these counts separately of their own accord, independent of each other.
>
> And then four is the admissibility of evidence in separate trials, if not joined for trial. And that's basically a [ER] 404(b) analysis. . . .
>
> So [the State] pointed out that [it] thinks that this falls under common scheme or plan, and evidence of common scheme or plan may be used to show whether the incidents actually occurred or whether the victim is fabricating or mistaken. Evidence of other similar acts of sexual abuse is generally very probative of a common scheme or plan, and the need for such proof is unusually great in child sex cases and that's because, in most instances, the victim is younger, number one. Number two -- and so that, you know, their memory may be faulty. And number two, there's always -- not always, but in most instances, there's a delayed disclosure.
>
> In addition to that, the court can certainly conceptualize that . . . if we're talking about charged offenses and uncharged offenses, that the uncharged offenses would be admissible for the purposes of motive and intent. Even though motive is not an element of the crime, the prosecutor is entitled to present evidence of such. And certainly to the extent here that these -- you know, that these acts are similar

4

to each other, they occurred in relatively the same place, and these are sisters, I believe. Their mother may or may not have been present.

And the other thing that I find really interesting in the description . . . is the similarities in what it's alleged that Mr. Pittman said to each victim is rather manipulative . . . I think [it] goes [to] the issue of not only common scheme or plan but motive and intent.

3 RP at 237-39.

The trial court noted that although it was denying Pittman's motion, Pittman could renew his severance motion at any time. Pittman did not renew his severance motion.

EC'S TESTIMONY

EC testified that he and Pittman initially got along well, and Pittman acted like a "dad figure" to him, helping take care of him. 6 RP at 302. But their relationship changed when AC started her evening job. One night, when AC had gone to work, Pittman and EC went into AC's bedroom and laid on the bed together before Pittman made EC kiss him a couple of times on the lips. EC smelled alcohol on Pittman's breath during this incident, and EC primarily felt scared. After kissing EC, Pittman used his hand to touch EC's vagina, and he made EC put his hand on Pittman's penis. Pittman touched "a little bit inside [EC's vagina] . . . [but] [m]ostly outside."[3] 6 RP at 339.

Within the same month of the first incident, EC and Pittman were on AC's bed, and Pittman put his penis against and inside EC's anus. EC smelled alcohol on Pittman's breath.

EC further testified that on another occasion, Pittman licked the inside and outside of EC's vagina but mostly the outside of EC's vagina. EC felt uncomfortable, but Pittman told EC

---

[3] At times, EC struggled to testify and could not clearly remember details of the incidents.

that it was okay for him to lick EC's vagina because he also did this to his daughter, and his daughter liked it.[4]

EC also testified to an additional encounter when AC and his younger brother were asleep in the same bed as EC. EC wore zip down pajamas, which Pittman repeatedly tried to unzip. According to EC, Pittman unzipped his pajamas "all the way down" a couple of times and tried to touch EC's stomach area, but he moved Pittman's hand and zipped his pajamas back up because he felt uncomfortable. 6 RP at 340-41. EC disclosed the sexual abuse after Pittman moved out.

MID-TRIAL RECESS

Mid-trial, while the State was still presenting its case-in-chief, Pittman informed the trial court that he found his father, who had committed suicide, in Pittman's garage. Pittman requested a recess, but otherwise, the parties were unsure of how to proceed. The trial court discussed various concerns about "calling a recess of sort of unknown length," including that witnesses had travelled from out of state; defense counsel had asked the court to accommodate his travel plans; the jury had been informed of when their duties would end; and EC had already testified, which appeared to be a "very traumatic experience" for him. 5 RP (Jan. 8, 2024) (5 RP) at 453, 454.

The trial court expressed its sympathy for Pittman's situation and recessed the trial for 24 hours, stating, "[C]learly, that doesn't mean that Mr. Pittman is going to be beyond this in 24 hours, but at this point, given all the factors that we've discussed, I think that's the best we can

---

[4] Pittman's daughter was 13 or 14 years old at the time.

do short of recessing for a couple of weeks or declaring a mistrial." 5 RP at 454. Trial resumed after the recess.

EP'S TESTIMONY

EP testified that she and Pittman initially got along well because Pittman would give her marijuana.[5] And "[w]hatever [she] wanted, he would . . . go get it." 6 RP at 522. EP's relationship with Pittman changed after an incident where Pittman was "super drunk" and told EP in front of her friend that they "should f[*]ck." 6 RP at 525.

One night, EP "was drunk," feeling "really out of it," sitting on her bedroom floor, and wearing only a tank top and underwear when Pittman came into her room and started rubbing her leg. 6 RP at 537. AC was asleep in another room.

EP testified that Pittman grabbed the back of EP's hair and "forced [her] to suck his d[*]ck." 6 RP at 540. Pittman "forc[ed]" her to go "up and down" on his penis until he ejaculated in her mouth. 6 RP at 541. Then, Pittman left the room. When EP woke up the next morning, she was not sure if she had imagined the incident. She "just . . . felt so violated." 6 RP at 543. EP eventually talked to Pittman to confirm whether the incident had occurred, and Pittman "act[ed] . . . really confused and . . . mix[ed] up his words." 6 RP at 544.

EP also testified that what happened to her was not a dream and was real. EP stated the incident "was a blur," and that she did not understand what was happening. 6 RP at 540. Initially, EP thought that the man "might have been some dude [she] was messing with." 6 RP at 540. But as the incident progressed, she realized "that [she was] in [her] own house and . . . not even anywhere with another dude." 6 RP at 540.

---

[5] At the time, EP regularly smoked marijuana and drank alcohol.

7

Less than one month later, EP was in her pajamas and lying on her bed when Pittman came into her room, laid next to her, "grabb[ed]" her pajama pants, and started touching her butt and thighs. 6 RP at 549-50. Without saying anything, Pittman started to pull down EP's pants. EP looked at Pittman and pushed him "a little bit," but Pittman pushed her arm down. 6 RP at 550. EP "kind of just gave up after he pushed [her] arm down" because she was weak from being "drunk, [and] had no strength in [her] arms." 6 RP (January 9, 2024) at 570. EP asked Pittman what he was doing, but Pittman did not respond. He pulled EP's pants down and penetrated her vagina with his penis for about five minutes until Pittman ejaculated inside of her. He then pulled his pants back up and left the bedroom. EP never spoke to Pittman about the incident.

The trial court admitted exhibit 7, EP's handwritten statement made during her forensic interview, which states, "[Pittman] would wait until I was sleeping or super out of it because the drugs I used to take and he would come into my room and rape me . . . rape as in have unwanted intercourse." Ex. 7. EP testified that she was slightly uncomfortable with talking about the incidents because she had not wanted to "come forward at all" but was "encouraged to do so" by her mother. 6 RP at 560-61.

### PITTMAN'S TESTIMONY AND MOTION FOR NEW TRIAL

Pittman testified at trial, denying all allegations. When asked whether he had ever done anything he was ashamed of while drinking between 2018 and 2020, Pittman testified that he "wouldn't remember." 7 RP (Jan. 10, 2024) (7 RP) at 727.

The trial court instructed the jury, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 88.

The jury found Pittman guilty of three counts of first degree child rape involving EC and two counts of second degree rape involving EP.[6] The jury found by special verdict that Pittman used his position of trust or confidence to facilitate the commission of the crimes. CP at 116-22. The court imposed a standard range sentence totaling 318 months to life in prison.

Pittman moved for a new trial under CrR 7.5(a)(2), arguing that juror 2 likely committed misconduct. During voir dire, when the trial court asked the venire whether anyone knew Pittman or the trial attorneys, juror 2 did not respond affirmatively. Pittman was concerned that the juror 2 (the presiding juror) likely knew him and other involved parties because juror 2 attended the same high school as Pittman. Pittman's wife discovered that Pittman and juror 2 had many mutual friends on social media and that Pittman had "liked" or otherwise reacted to some of juror 2's public social media posts. CP at 137-140. Pittman's counsel acknowledged that during voir dire, Pittman mentioned that he may know juror 2, but counsel did not ask juror 2 whether juror 2 recognized Pittman. Pittman suggested at the hearing on the motion for a new trial that the trial court could speak with juror 2.

The State responded that Pittman provided no analysis to meet his burden of showing that juror misconduct occurred. In its supplemental response, the State transcribed recordings of jail phone calls between Pittman and his wife, arguing that they "conspired to present evidence to the Court that would falsely give the appearance that juror #2 knew Mr. Pittman." CP at 151.

The trial court denied Pittman's motion for a new trial, finding that Pittman had not shown juror 2 was actually or impliedly biased. Pittman appeals his convictions.

---

[6] The jury also found Pittman guilty of two counts of third degree rape involving EP, but the trial court later vacated Pittman's two convictions for third degree child rape involving EP.

9

ANALYSIS

I. MOTION TO SEVER CHARGES AND INEFFECTIVE ASSISTANCE OF COUNSEL

Pittman argues the trial court abused its discretion by denying his motion to sever the charges for trial, thereby unfairly prejudicing him. He also contends that, to the extent he waived his right to challenge the court's denial of his motion to sever, he received ineffective assistance of counsel. The State responds that Pittman waived his severance claim by failing to renew his motion during trial, and Pittman fails to show the outcomes would have been different if the charges had been severed. We agree with the State.

A.     *Pittman Waived the Severance Issue*

We review a trial court's denial of a motion to sever for manifest abuse of discretion. *State v. Medina*, 112 Wn. App. 40, 52, 48 P.3d 1005 (2002). To show that the trial court abused its discretion in denying severance, the defendant "must be able to point to specific prejudice." *State v. Bythrow*, 114 Wn.2d 713, 720, 790 P.2d 154 (1990). If the trial court has denied a defendant's pretrial motion to sever, they may renew the motion on the same ground "before or at the close of all the evidence." CrR 4.4(a)(2). If the party does not timely make or renew a motion for severance, "[s]everance is waived." CrR 4.4(a)(1), (2); *State v. McDaniel*, 155 Wn. App. 829, 859, 230 P.3d 245 (2010) (holding that where McDaniel failed to renew his severance motion, he waived the issue of whether the trial court abused its discretion by denying the motion, thus limiting the court's discussion of the issue within his ineffective assistance of counsel).

Here, Pittman timely moved to sever the charges involving EC from those involving EP. However, Pittman failed to renew his motion before or at the close of all the evidence.

Accordingly, we hold that this issue is waived and address it only within the discussion of Pittman's ineffective assistance of counsel claim.

B.       *Pittman's Ineffective Assistance of Counsel Claim Fails*

Pittman contends his attorney provided ineffective assistance by failing to renew his motion to sever the charges.  We disagree.

Criminal defendants have a right to effective assistance of counsel.  U.S. CONST. amend. VI; WASH. CONST. art. I, §22.  When a defendant claims ineffective assistance of counsel, they must show their counsel's performance was deficient and resulted in prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Failure to make either showing defeats the claim.  *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).

First, counsel's performance is deficient if, based on the entire record, it falls below an objective standard of reasonableness.  *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).  The defendant must overcome the strong presumption that their counsel's performance was effective by showing there was no possible legitimate trial tactic that would explain counsel's performance.  *Bertrand*, 3 Wn.3d at 130; *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

Second, if a defendant's ineffective assistance of counsel claim is based on counsel's failure to make a motion, the defendant must demonstrate prejudice by first showing that the motion would likely have been granted.  *State v. Sutherby*, 165 Wn.2d 870, 884, 204 P.3d 916 (2009); *State v. Price*, 127 Wn. App. 193, 203, 110 P.3d 1171 (2005), *aff'd*, 158 Wn.2d 630 (2006).  Next, the defendant must show a reasonable probability that the outcome of the trial would have differed absent counsel's deficient performance.  *Sutherby*, 165 Wn.2d at 884;

*Bertrand*, 3 Wn.3d at 129. A mere showing that errors had some conceivable effect on the outcome of the proceeding is not enough. *Strickland*, 466 U.S. at 693.

Washington law does not favor separate trials. *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994). "Severance of charges is important when there is a risk that the jury will use the evidence of one crime to infer the defendant's guilt for another crime or to infer a general criminal disposition." *Sutherby*, 165 Wn.2d at 883. A defendant seeking severance bears the burden of showing that a trial involving all charges "would be so manifestly prejudicial as to outweigh the concern for judicial economy." *Bythrow*, 114 Wn.2d at 718.

Courts consider four nondispositive factors to assess the potential for prejudice to the defendant when determining whether to sever charges:

> (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.

*State v. Slater*, 197 Wn.2d 660, 677, 486 P.3d 873 (2021).

In considering the first factor, we look at whether the strength of the State's evidence on each count was similar. *State v. Russell*, 125 Wn.2d 24, 63-64, 882 P.2d 747 (1994). "When one case is remarkably stronger than the other, severance is proper." *State v. MacDonald*, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004). Here, the evidence for the charges involving EC and EP was not distinctly stronger in one instance over the other. The primary evidence for each count was EC and EP's testimonies. There was no physical evidence or corroborating witnesses concerning the allegations of sexual abuse. Pittman testified, denying all allegations. Because the strength of the type of evidence as to the counts involving EC and EP was similar, the first factor weighs against severance.

12

Regarding the second factor, the likelihood that joinder will cause a jury to be confused about the defendant's defenses is "very small where the defense is identical on each charge." *Russell*, 125 Wn.2d at 774. Pittman's defense on each count was identical—general denial. Pittman confirmed with the trial court that the defenses for both sets of counts would be the same, stating, "the title of the defense would be the same: [g]eneral denial for both." 3 RP at 225-26. At trial, Pittman testified and denied all allegations of sexual abuse. The joinder of the charges did not affect Pittman's ability to make his defenses clear to the jury. Thus, the second factor weighs against severance.

As for the third factor, the parties do not dispute that the trial court instructed the jury to decide each count separately. Specifically, the instruction stated, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 88. Courts have repeatedly found this instruction sufficient to mitigate prejudice to the defendant when offenses are joined. *See, e.g.*, *Bythrow*, 114 Wn.2d at 723; *McDaniel*, 155 Wn. App. at 859; *State v. Cotten*, 75 Wn. App. 669, 688, 879 P.2d 971 (1994).

Pittman now claims that the trial court should have given a limiting instruction to "not use evidence of one crime to decide guilt for a separate crime." Br. of Appellant at 17; *see* *Sutherby*, 165 Wn.2d at 885-86. But because Pittman failed to request a limiting instruction during the trial, he is precluded from arguing that the lack of a limiting instruction was error. *State v. Athan*, 160 Wn.2d 354, 383, 158 P.3d 27 (2007) (stating that "the failure of a court to give a limiting instruction is not error when no instruction was requested"). Thus, the third factor weighs against severance.

13

Pittman primarily challenges the fourth factor. This factor considers whether evidence of each charge would be cross admissible in separate trials under ER 404(b) if severance was granted. *Russell*, 125 Wn.2d at 66.

ER 404(b) prohibits evidence of "other crimes, wrongs, or acts" to prove the character of a person in order to show that they acted in conformity with that character. However, ER 404(b) permits evidence of prior bad acts for other, limited purposes, such as to show intent, motive, preparation, or plan, among other things.

The trial court concluded that evidence for the charges involving EC and EP would be cross admissible in separate trials to show a common scheme or plan as well as motive and intent. Pittman contends that while the different charges may have shared some basic similarities, they did not show any type of overarching plan or ongoing scheme. We disagree.

To admit evidence of a common scheme or plan, there must be "substantial similarity between the prior bad acts and the charged crime." *State v. DeVincentis*, 150 Wn.2d 11, 21, 74 P.3d 119 (2003). There is sufficient similarity where the "various acts are naturally to be explained as caused by a general plan." *State v. Lough*, 125 Wn.2d 847, 860, 889 P.2d 487 (1995). "[A] common plan or scheme may be established by evidence that the [d]efendant committed markedly similar acts of misconduct against similar victims under similar circumstances." *Id.* at 852.

Here, the evidence demonstrated a common scheme or plan. Pittman abused similar victims—EC and EP were minor-aged siblings, were Pittman's ex-girlfriend's children, and were living in the same home as him. Additionally, Pittman abused EC and EP in similar ways and under similar circumstances. At the severance motion hearing, Pittman acknowledged as much, stating, "These two sets of counts are certainly similar, right? The nature in and of themselves,

14

the words themselves of what the type of crime is is certainly similar. The relationship to Mr. Pittman is also similar. The residence is also similar." 3 RP at 222-23.

Pittman first befriended EC and EP. Both siblings testified that initially, they got along well with Pittman. EC testified that Pittman acted like a "dad figure" to him, taking care of him. 6 RP at 302. And EP testified that Pittman would give her marijuana, and "[w]hatever [she] wanted, he would . . . go get it." 6 RP at 522. During overlapping periods of time, Pittman then began sexually touching and penetrating both EC and EP. All incidents of abuse occurred in the same house, at night, and while EC and EP were under Pittman's care. The evidence shows Pittman committed similar acts of abuse against similar victims under similar circumstances. *Lough*, 125 Wn.2d at 852. Thus, the evidence for the charges involving EC and EP would have been cross admissible in separate trials to show a common scheme or plan. Thus, the fourth factor weighs against severance.

The State contends that even if the evidence for counts involving EC and EP was not cross admissible, severance was not required. Br. of Resp't at 32. We agree.

A lack of cross admissibility does not necessarily constitute a sufficient ground for severance. *Slater*, 197 Wn.2d at 679; *Bythrow*, 114 Wn.2d at 720. The defendant must still demonstrate that the prejudicial effect of not severing the charges outweighs the need for judicial economy. *Slater*, 197 Wn.2d at 679.

> When the issues are relatively simple and the trial lasts only a couple of days, the jury can be reasonably expected to compartmentalize the evidence. . . . Under these circumstances, there may be no prejudicial effect from [not severing] even when the evidence would not have been admissible in separate trials.

*Bythrow*, 114 Wn.2d at 721.

Here, the issues were relatively simple; testimony lasted for two-and-a-half days; only

EC and EP testified as to the acts of sexual abuse; and EC and EP each described distinct

incidents even though Pittman committed similar acts of sexual abuse against them. Thus, the

jury could be reasonably expected to compartmentalize the evidence. *Bythrow*, 114 Wn.2d at

721. And as explained above, the trial court instructed the jury to consider each count separately

and to not allow the verdict on one count to control the verdict on any other count, and we

presume jurors follow instructions. *Lough*, 125 Wn.2d at 864.

Pittman fails to demonstrate that the prejudicial effect of not severing the charges

outweighs the need for judicial economy where no prejudice-mitigating factor is dispositive and

all four factors weigh against severance. Considering the four factors, severance of the charges

was not required. Because Pittman fails to show that a motion to renew his severance motion

would likely have been granted, he likewise fails to show a reasonable probability that the

outcome of the trial would have differed absent counsel's alleged deficient performance.

Because Pittman cannot show prejudice, his ineffective assistance of counsel claim based on a

failure to renew a motion to sever charges fails.

## II. STATEMENT OF ADDITIONAL GROUNDS

Pittman raises multiple claims in his SAG. We hold that Pittman's SAG claims are

unreviewable or fail on the merits.

### A. *Legal Principles*

We will "review the decision or parts of the decision designated in the notice of appeal."

RAP 2.4(a). RAP 10.10(a) allows criminal defendants to "file a pro se statement of additional

grounds for review to identify and discuss those matters related to the decision under review."

(Emphasis added.) Here, the decision under review is Pittman's convictions for three counts of first degree child rape and two counts of second degree rape.

We will consider an issue raised in a SAG only when it adequately informs us of "the nature and occurrence of alleged errors." RAP 10.10(c); *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). We do not address claims on direct appeal that depend on evidence outside the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

B.      *Hearing to Determine Juror Bias*

Pittman challenges the trial court's denial of his motion for a new trial. He claims that the trial court abused its discretion by not holding an evidentiary hearing because "there was a high probability" juror 2 knew Pittman and other involved parties and was actually biased. SAG at PDF 6 (capitalization omitted).[7] We disagree.

We review a trial court's denial of a motion for a new trial for an abuse of discretion. *State v. Meza*, 26 Wn. App. 2d 604, 609, 529 P.3d 398 (2023). A trial court abuses its discretion when its decision is based on untenable grounds or made for untenable reasons. *Meza*, 26 Wn. App. 2d at 609. Courts should hold an evidentiary hearing before ruling on a motion for a new trial when "the moving party has made a prima facie showing of [juror] bias." *State v. Jackson*, 75 Wn. App. 537, 544, 879 P.2d 307 (1994).

To prove juror 2 should have been disqualified for actual bias, Pittman must demonstrate "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). In a

---

[7] The attachments to the SAG contain no pagination, therefore, we cite to the PDF document number.

challenge for actual bias, the challenged juror's expressed opinion or appearance of a formed opinion alone is insufficient to sustain the challenge. RCW 4.44.190. "[T]he court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190. "Actual bias must therefore be established by proof." *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 808, 425 P.3d 807 (2018). A mere possibility of bias is insufficient to prove actual bias. *Id.* at 809. The trial court ruled Pittman did not meet his burden.

Here, Pittman failed to make a prima facie showing of actual bias. Even assuming without deciding that juror 2 knew Pittman or others involved in the case, the record contains no indication that juror 2 had formed an opinion about Pittman or that such opinion would prevent juror 2 from trying the case impartially. At most, Pittman showed a mere possibility of bias, which is insufficient to prove actual bias or to satisfy the prima facie standard of showing actual bias for the court to hold a hearing. *Sassen Van Elsloo*, 191 Wn.2d at 809; *Jackson*, 74 Wn. App. at 544. Thus, the trial court did not abuse its discretion by not holding an evidentiary hearing before denying Pittman's motion for a new trial.

C.      *Mental Health Evaluation*

Pittman contends that the trial court abused its discretion by not holding an evidentiary hearing to assess his "trauma and mental health status" following his father's death. SAG at PDF 8 (capitalization omitted). But Pittman, through his counsel, did not request an evidentiary hearing on his mental health from the trial court. Rather, Pittman requested a recess of unknown length, and after the trial court discussed various concerns with recessing trial, it permitted a 24-hour recess. The next day, Pittman did not ask for a further recess; instead, Pittman notified the court that if an emotional event occurred, he would ask for a recess. Because the record

shows neither that Pittman made any request for an evidentiary hearing on his mental health nor that Pittman's mental health precluded him from continuing with the trial after the brief recess, this claim fails.

D.      *Prosecutorial Misconduct*

Pittman asserts that the State engaged in various instances of "misconduct." SAG at PDF at 19. We disagree.

To prevail on a claim of prosecutorial misconduct, Pittman must demonstrate "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). Pittman must show prejudice by proving that "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" *Id.* (alteration in original) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)). If Pittman failed to object, the "failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Russell*, 125 Wn.2d at 86.

Pittman contends that many of the State's comments during the proceedings were improper and cites various parts of the record, notably where Pittman did not object. *See, e.g.*, SAG at PDF 12 (the State alleged to have mispresented evidence); SAG at PDF 17 (the State alleged to have impugned defense counsel during closing argument); SAG at PDF 18 (the State alleged to have improperly injected itself during EP's testimony); SAG at PDF 19 (the State alleged to have expressed its personal belief in the veracity of the witnesses during closing argument); SAG at PDF 20 (the State alleged to have vouched for a witness); SAG at PDF 22

(the State alleged to have made inconsistent remarks showing misconduct). But Pittman does not argue, let alone show, that these comments, taken in context, prejudicially affected his trial. Moreover, Pittman fails to show that the State's remarks were so flagrant and ill-intentioned such that the resulting prejudice could not have been cured by jury instructions. Thus, Pittman's prosecutorial misconduct claims are waived.

E.      *Inadmissible Evidence*

Next, Pittman claims the trial court erred by admitting EP's handwritten statement into evidence. Pittman baldly asserts that the trial court erred because the State failed to demonstrate that the written statement "contained minimal guarantees of truthfulness, or that [EP's] statement was given under penalty of perjury." SAG at PDF 21 (capitalization omitted). We disagree.

Prior to the trial court admitting EP's handwritten statement, the State showed EP the handwritten statement while EP was testifying under oath. EP confirmed the handwriting was hers. EP testified that she had read the statement, that she made the statement, and that the statement was true. Thus, Pittman's claim that the trial court erred by admitting the handwritten statement into evidence fails. To the extent that Pittman is arguing that EP was not credible, we do not review that claim on appeal because credibility determinations are solely for the trier of fact. State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

Relatedly, Pittman contends that his attorney was ineffective for not objecting to the admission of EP's written statement into evidence. Because Pittman fails to show that the trial court erred in admitting EP's written statement, his ineffective assistance of counsel claim based on a failure to object to that evidence fails.

F.       *Right to Fair Trial*

Pittman also claims his right to a fair trial was prejudiced "[f]rom the very begin[ni]ng" because the deputy prosecutor left "a note" stating Pittman was being "charged in superior court for the crimes [he was] now convicted of" on an information in a different matter in district court. SAG at PDF 23-24 (capitalization omitted). Pittman also claims his presumption of innocence was denied because the deputy prosecutor allegedly told defense counsel, "It [is] about [Pittman's attorney] proving [Pittman's] innocen[ce]." SAG at PDF 24(capitalization omitted). These claims rely on evidence outside of the record on appeal. Therefore, we do not consider them in this direct appeal.[8] *McFarland*, 127 Wn.2d at 338.

G.       *Insufficient Record on Appeal*

Pittman claims the trial court violated his due process rights because the record on appeal is incomplete. He asserts that the verbatim report of proceedings for only one of five continuance hearings is part of the record because the clerk's office does not put agreed continuances on the record. Pittman argues that this "does not forf[e]it [his] right to effect[ive] review of the record on appeal." SAG at PDF 14 (capitalization omitted).

Criminal defendants have the right to appeal in all cases. WASH. CONST. art. I, § 22. A criminal defendant is "'constitutionally entitled to a record of sufficient completeness to permit effective appellate review'" of their claims. *State v. Waits*, 200 Wn.2d 507, 509-10, 520 P.3d 49 (2022) (quoting *State v. Tilton*, 149 Wn.2d 775, 781, 72 P.3d 735 (2003)). A complete verbatim transcript is not necessarily required for a record to be sufficiently complete for appellate review.

---

[8] The appropriate means of raising issues that rely on evidence outside of the trial record is doing so through a personal restraint petition. *McFarland*, 127 Wn.2d at 335; *see also Grier*, 171 Wn.2d at 29.

No. 59432-3-II

*Waits*, 200 Wn.2d at 510. The facts necessary to adjudicate Pittman's claims on appeal are in the record, and he does not otherwise show that the record is not sufficiently complete to permit effective appellate review. Therefore, this claim merits no further consideration.

CONCLUSION

We hold that because Pittman failed to renew his motion to sever the charges before or at the close of all the evidence, this issue is waived; Pittman's ineffective assistance of counsel claim fails because he has not shown prejudice; and Pittman's SAG claims are unreviewable or fail on the merits.

Accordingly, we affirm Pittman's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

L__, J.

Veljacic, A.C.J.

22